UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WILLIAM H. PIPPIN and <br> LOLA JEAN PIPPIN, <br><br> Plaintiffs, <br><br> v. <br><br> HILL-ROM COMPANY, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 4:08CV263 TIA <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (Docket No. 28). Plaintiffs filed a Memorandum in Opposition (Docket No. 34) and Defendant filed a Reply (Docket No. 36) thereto. All matters are pending before the undersigned United States Magistrate Judge, with the consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiffs William H. Pippin and Lola Jean Pippin originally filed a three-count petition against Defendant Hill-Rom Company, Inc. ("Hill-Rom"), in the Circuit Court of Buchanan County, State of Missouri on August 20, 2007. (Docket No. 1/filed October 12, 2007). In the petition, Plaintiffs allege claims of negligence (Count I) and loss of consortium (Count II). On October 12, 2007, Hill-Rom removed the case to this court asserting diversity jurisdiction and the amount in controversy exceeds $75,000. In particular, Plaintiffs' negligence claims are based upon Hill-Rom's alleged failure to provide a reasonably safe loading area and to load the beds into Plaintiffs' truck. Further, Plaintiffs allege that Hill-Rom instructed Plaintiff William Pippin to load the beds into Plaintiffs' truck while it was parked on an inclined surface and to position the truck on an inclined surface for purposes of loading.

Hill-Rom has filed a motion for summary judgment claiming that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Plaintiffs have responded to Hill-Rom's motion to which Hill-Rom has replied.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of proof is on the moving party to set forth the basis of the motion, Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. Id. The non-moving party may not rest upon her pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. Celotex, 477 U.S. at 324.

Summary judgment is a harsh remedy and should not be granted unless the movant "has established [its] right to judgment with such clarity as to leave no room for controversy." New England Mutual Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). The Eighth Circuit has noted, however, that "summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir. 1988).

**The Undisputed Evidence before the Court on the Motion**

Viewing all facts and drawing all reasonable inferences in the light most favorable of the nonmoving party, A. Brod, Inc. v. SK & I Co., L.L.C., 998 F. Supp. 314, 320 (S.D.N.Y. 1998) the Court sets forth the following facts:

Defendant Hill-Rom Company, Inc. ("Hill-Rom") is an Indiana corporation engaged in the manufacture and sale of hospital and home health care equipment, including hospital beds. (Petition, Def. Exh. 2, Count 1 at ¶ 2). Starting in 1993, Plaintiff William Howard Pippin ("Pippin") and his wife, Plaintiff Lola Jean Pippin ("Mrs. Pippin") began driving a truck as independent contractors for carrier Landstar Express America, Inc. ("Landstar'), a shipping company used by Hill-Rom over the years to transport Hill-Rom products. (Pippin Depo., Def. Exh. 1, p. 22; Vogelsang Decl., Def. Exh. 4, ¶5). Landstar is a non-forced dispatch trucking company, and so an independent trucker is free to accept or decline a load for which he is dispatched depending upon a variety of circumstances. (Vogelsang Decl., Exh. 4, ¶5).

While loading Hill-Rom hospital beds on September 9, 2002, into Plaintiffs' truck in the parking area in front of Hill-Rom's leased facility in St. Joseph, Missouri, Pippin allegedly sustained injuries to his back. (Def. Exhs. 7 and 9).

A.    Landstar's Agreements with Hill-Rom and Plaintiffs

In 1993, Plaintiffs started driving a cargo van for Landstar Express America, Inc. ("Landstar"). (W. Pippin Depo, Pltf. Exh. 1, Exh. 1, 21-24).

On January 28, 2002, Landstar entered into a Transportation Agreement ("Transportation Agreement") with Hill-Rom, whereby Landstar agreed to operate as a carrier for Hill-Rom's freight. (Transportation Agreement, Def. Exh. 3). The Transportation Agreement is a form agreement

Landstar uses with its customers. (Vogelsang Decl., Def. Exh. 4, ¶ 6). Under the Transportation Agreement, Hill-Rom procures shipping services from Landstar for a term of one year at a negotiated price. (Id. at ¶ 5). A separate paragraph titled "Loading Responsibility" specifically provides as follows: "Except as otherwise provided in writing, prior to the time of dispatch, shipments transported by [Landstar] must be loaded by Shipper and unloaded by consignee from or on [Landstar's] vehicle." (Transportation Agreement, Def. Exh. 3, ¶ 9). This provision allocates the cost of paying for loading services to the customer inasmuch as Landstar does not pay its drivers to load product, the cost of providing such services in not built into Landstar's price structure to its customers. (Vogelsang Decl., Def. Exh. 4, ¶ 7). Hill-Rom assumes that a shipper provides worker's compensation insurance to its driver force or facilitates the drivers obtaining such insurance on their own to cover the risk of injury incurred in loading. (Id.). Depending upon the nature of the load, the availability of Hill-Rom personnel to perform loading operations, the capabilities of the facility from which the product is being shipped, the type of truck supplied by the consignee, and other factors, Hill-Rom may or may not load product consigned to a transportation service like Landstar. (Id. at ¶ 8). Because the St. Joseph facility is a smaller operation, the facility is not equipped with loading dock facilities or staffed with loading personnel. (Id.). Hill-Rom allows a driver dispatched to pick up a load at the St. Joseph facility to load the product himself if he wishes so long as the driver does not injure the product or endanger Hill-Rom personnel. (Id.). By loading jobs without asking for additional compensation, Pippin continued to receive profitable dispatches. (Id. at 97).

On April 28, 1997, Plaintiffs and Landstar entered into an Independent Contractor Agreement ("Trucker's Agreement") wherein the terms and conditions governing Plaintiffs' transportation of freight when dispatched by Landstar are set forth. (Trucker's Agreement, Exh. 5). Paragraph eleven

of the Trucker's Agreement titled "Loading and Unloading," explicitly placed the obligation to load shipments which the truckers were dispatched on Plaintiffs, the independent contractor. (Trucker's Agreement, Exh. 5, ¶ 11). Pippin testified that he was aware of the obligation and understood that there would be times when he was responsible for loading and unloading. (W. Pippin Depo., Deft. Exh. 1, 134). When shippers did not load and Plaintiffs instead loaded, Plaintiffs would notify Landstar of the loading, and Landstar would reimburse Plaintiffs. (Id. at 95-96). Pippin acknowledged that he was not aware of a custom or practice in the industry requiring shippers to load goods. Paragraph thirty of the Trucker's Agreement provides that Plaintiffs have "the right to decide what haulage to perform under this Agreement; provided however, that when a load is accepted by Independent Contractor the haulage will be performed." (Trucker's Agreement, Deft. Exh. 5, ¶ 30). Likewise, Pippin testified that he maintained the right to decline any load for which he was dispatched. (W. Pippin Depo., Deft. Exh. 1, 134). Indeed, on ten to fifteen occasions, Plaintiffs had refused loads for various reasons including the weight of the load, insufficient pay, and the location of the loading area. (Id. at 134-35; L. Pippin Depo, Deft. Exh. 6, 55, 61-62). Plaintiffs did not have to give a reason for refusing any load but merely had to inform the dispatcher that they refused the load and then wait for Landstar to issue another dispatch. (W. Pippin Depo., Deft. Exh. 1, 135, 137-39).

On September 8, 2002, Landstar arranged for Pippin via a page dispatch to pick up the hospital beds from Hill-Rom's service facility in St. Joseph, Missouri and transport the hospital beds to Tempe, Arizona. (W. Pippin Depo., Deft. Exh. 1, 51, 54). Plaintiff testified that he had been dispatched to this Hill-Rom facility, because his truck had a liftgate. (Id. at 56). At the time of the dispatch, Landstar never indicated Plaintiffs would have to load, but that Plaintiffs would need a

liftgate. (Id.). Plaintiffs had previously transported freight consisting of hospital beds and wheelchairs for Hill-Rom on more than five occasions. (Id. at 122-23). Pippin testified that he had never physically loaded hospital beds upon his truck. (W. Pippin Depo., Pltf. Exh. 1, 60-62).

B.     The Hill-Rom Facility in St. Joseph, Missouri

Starting on July 1, 1998, Hill-Rom leased its space in a multi-tenant building complex from landlord Mitchell Woods LLC ("Landlord") pursuant to a lease. (Lease, Deft. Exh. 7, 2; Photographs, Deft. Exh. 9, # 7). The Hill-Rom facility in St. Joseph, Missouri is located in Corporate Center, an industrial park. (Lease, Deft. Exh. 7, 1). Corporate Center is a multi-tenant building located at 5802 Corporate Drive. (Lease, Deft. Exh. 7, 14).

Hill-Rom's leased space, Suite C, consists of 1,500 square feet of interior premises, entrances comprised of a truck bay with a garage door adjacent to a storage area, and a door adjacent to the interior office space. (Lease, Deft. Exh. 7, 1-2; Photographs, Deft. Exh. 9, #16). The Hill-Rom facility fronts a common parking area. (Photographs, Deft. Exh. 9, # 16). The loading area at the Hill-Rom facility is located in the parking area in front of the leased premises. (Deft. Exh. 9, #13).

In relevant sections, the lease amendment executed by Hill-Rom and Mitchell Woods, LLC, the owner/landlord, specifies that "Landlord expressly reserves to itself all right, title, and interest in and to the sidewalk, walkways, driveways, parking areas or other portions of said complex not herein expressly demised to Tenant or others, which shall be known as 'Common Areas.'" (Lease, Deft. Exh. 7, ¶ 7). Further, the lease specifies that the Landlord is responsible for constructing sidewalks, walkways, and driveways, to the extent reasonably necessary to serve the complex and maintaining the parking area. (Id.). Pursuant to the lease, Hill-Rom and its invitees have the right to use the common areas, but the Landlord specifically prohibited truck parking in front of the loading docks

"other than the immediate loading and unloading of goods or materials." (Id. at ¶ 9). Although the lease allowed Hill-Rom to make alterations "in or to the interior of the demised premises," there is no provision allowing Hill-Rom to alter the common areas. (Id. at ¶ 13).

The Hill-Rom St. Joseph facility only handles hospital beds. (Karguth Depo., Pltf. Exh. 9, 8). Hill-Rom hired Mr. Alan Karguth ("Karguth") as a customer service representative at the St. Joseph facility in 1998. (Id. at 4). Karguth's duties included repair and delivery of hospital beds. (Id. at 8).

C.  Plaintiffs' Truck

Plaintiffs' truck was a 1993 Freightliner six-wheel, two-axle truck with a 22-foot box and a sleeper cab purchased from Landstar. (W. Pippin Depo., Deft. Exh. 1, 35-36; Pltf. Exh. 1, 32-34). After owning the truck for one year, Plaintiffs installed a liftgate on the truck in order to load freight at locations without a loading dock. (Id. at 42-45; 95-97). Pippin explained how dispatches requiring liftgates to load were more numerous and more profitable than dispatches not requiring the driver to load. (Id. at 42-43). Indeed, Pippin testified that he liked to run hospital beds and slot machines inasmuch as there was a demand and not many trucks could take such loads due to the lack of a liftgate required for loading. (Id. at 45). Pippin testified that he loaded the truck less than one percent of the trips he made for Landstar. (Id. at 38).

D.  The September 9, 2002 Incident

On September 8, 2002, Landstar dispatched Plaintiffs to pick up a load of three hospital beds from the Hill-Rom facility on September 9, 2002, and transport the load to Tempe, Arizona. (W. Pippin Depo., Deft. Exh. 1, 51,60). At the time of the dispatch and the acceptance of the same by Plaintiffs, there was no indication that Plaintiffs had to load the truck. (Id. at 56). After accepting

the dispatch, Plaintiffs drove through the night from Omaha, Nebraska and arrived at the Hill-Rom facility in St. Joseph for the first time around 7:00 a.m. (Id. at 51, 59-60). Although Pippin had previously hauled on occasion hospital beds similar to the beds Landstar dispatched him to pick up from the Hill-Rom facility, the transportation of hospital beds was not the majority of his runs. (Id. at 53, 62-63). On at least one prior occasion, Pippin had loaded Hill-Rom hospital beds with assistance into the truck but without extra compensation although he had not anticipated having to load the beds when dispatched. (Id. at 127). After learning that Hill-Rom would not be responsible for loading the hospital beds, Pippin did not contact and apprise Landstar regarding this matter. (Id. at 96).

On September 9, 2002, Alan Karguth, a Hill-Rom customer representative, arrived at the Hill-Rom facility as scheduled for work around 8:00 a.m. (Karguth Depo., Deft. Exh. 8, 40-41). As directed by Mr. Karguth, Pippin backed his truck into a space next to a parked Hill-Rom truck and at an angle to the loading area in front of the facility. (W. Pippin Depo., Exh. 1, 64, 67; Photographs, Deft. Exh. 9, # 2). Mr. Karguth requested Pippin to accommodate him by backing his truck to the space as indicated, adjacent to a parked Hill-Rom truck, because the parked truck was difficult to start. (W. Pippin Depo., Exh. 1, 60, 64). While parking the truck, Pippin noticed the parking lot was not level but inclined slightly because the surface was graded away from the entrance of the facility. (W. Pippin Depo., Exh. 1, 70-71; Photographs, Deft. Exh. 9, # 14). Pippin did not consider either the incline or the location of the parked Hill-Rom truck to present a problem for loading the hospital beds onto his truck. (W. Pippin Depo., Deft. Exh. 1, 71-73). After he backed the truck into the space in the parking area, Pippin manually set the air brake lock, and Mr. Karguth handed him paperwork concerning the shipment. (Id. at 73-74).

Mr. Karguth brought the beds to the rear of the truck, helped Pippin push the beds onto the liftgate, and then backed away. (W. Pippin Depo., Deft. Exh. 1, 75). Although Pippin thought the Hill-Rom employee would help him with the loading of the hospital beds, the employee made no attempt to do so. (Id. at 75-76). Mr. Karguth never discussed loading the beds with Pippin or provided instructions regarding loading, wrapping, and securing the hospital beds, but he gave Pippin some paperwork regarding the shipment. (Id. at 74, 88). Mrs. Pippin completed the waybill for the three hospital beds during the loading showing three hospital beds weighing a total of 1600 pounds to be transported and to be in good order unless otherwise noted. (Mrs. Pippin Depo., Pltf. Exh. 3, 32-35; Waybill, Pltf. Exh. 6). Pippin testified that when he first started loading, he did not think he needed any help. (W. Pippin Depo., Deft. Exh. 1, 77). Pippin operated the liftgate raising each bed to the level of the truck bed and then moving each bed into the truck by himself without asking for or receiving any assistance. (Id. at 75-77). Pippin had no difficulty moving the first bed onto the truck, although he had some difficulty holding onto the bed while loading. (Id. at 79). After successfully loading the first bed without difficulty, Pippin and Mr. Karguth loaded the second bed onto the liftgate and then Mr. Karguth stepped away. (Id. at 80). After setting the brake on the second bed, Pippin operated the liftgate using his feet. (Id. at 81). After unlocking the brake, Pippin began moving the second bed into the truck, but the bed started to move away from him, and so he turned to position his foot on the bed wheels' pedal brake. (Id. at 81-82). Pippin's attempt to stop the bed from rolling and to position his foot on the pedal brake caused him to lose his balance and thereafter twist around and pull a back muscle. (Id. at 83, 85-86). After hearing a noise like a grunt or groan in the back of the truck, Mrs. Pippin asked her husband what was wrong, and he responded that he thought he pulled a muscle. (Mrs. Pippin Depo., Pltf. Exh. 3, 36). In spite of the incident,

Pippin and Mr. Karguth loaded the last hospital bed onto the liftgate, and then Pippin loaded the third bed unassisted and without incident but he covered the bed with wrapping blankets before moving the bed. ((W. Pippin Depo., Deft. Exh. 1, 86-87; W. Pippin Depo., Pltf. Exh. 1, 90-91).

Pippin did not report this occurrence to anyone at Hill-Rom on September 9, 2002. (W. Pippin Depo., Deft. Exh. 1, 89). After loading the third hospital bed and having the waybill signed, Pippin drove the Truck to the Oklahoma state line, but his back pain prevented him from completing the drive. (Id. at 101). To alleviate the pain, Pippin took Hydrocodone. (Id. at 103). Mrs. Pippin completed the drive to Tempe, Arizona, and Plaintiffs delivered the beds to the designated destination in Tempe on September 10, 2002. (Id. at 101, 103). Pippin reported to Michael Fedorsick, the head of operations of dispatching loads for Landstar, his back injury a couple of days after the incident and requested a load home to St. Louis, because he could not work with the pain. (W. Pippin Depo., Pltf. Exh. 1, 112). Plaintiffs requested a load returning to St. Louis so that Pippin could seek treatment, because Medicare would not cover hospital expenses for out of area treatment. (Id. at 108). From Tempe, Plaintiffs traveled to several other destinations at Landstar's direction including southern California, northern California, Nevada, and South Dakota in order to work their way back to St. Louis. (Id. at 106-08, 113).

On September 29, 2002, Plaintiffs returned home for the first time after the occurrence at Hill-Rom and the other delivery trips. (Id. at 110). Pippin stopped driving for Landstar on September 28, 2002. (Id. at 118).

On October 4, 2002, Pippin reported having back pain to Landstar without first receiving medical treatment for his injury. (Occupational Accident Plan, Deft. Exh. 10; W. Pippin Depo., Pltf. Exh. 1, 114). The Occupational Accident Report is the first written record of notification by Pippin

to Landstar of injury stemming from the incident on September 9, 2002. (Occupational Accident Plan, Pltf.'s Exh. 7).

## Discussion

### A. Transportation Agreement

Hill-Rom asserts that summary judgment against Plaintiffs is proper in this case, because Plaintiffs are unable to establish that the Transportation Agreement with Landstar provides a basis for liability inasmuch as Plaintiffs are not a party to the Transportation Agreement. Further, Hill-Rom maintains that the existence of a contractual obligation does not give rise to a tort duty.

In the Transportation Agreement, Landstar agreed to operate as a carrier for Hill-Rom's freight.[1] In relevant part the agreement provides that Hill-Rom, the shipper, would perform loading. This provision allocates the cost of paying for loading services to the customer inasmuch as Landstar does not pay its drivers to load product, the cost of providing such services in not built into Landstar's price structure to its customers. Indeed, Pippin admitted that he had performed loading on numerous occasions regardless of what the carrier's agreement with a shipper stipulated. Likewise, Pippin was aware of the obligation and understood that there would be times when he was responsible for loading and unloading. When shippers did not load and Plaintiffs instead loaded, Plaintiffs would notify Landstar of the loading, and Landstar would reimburse Plaintiffs. Pippin acknowledged that he was not aware of a custom or practice in the industry requiring shippers to load goods.

Plaintiffs' cause of action cannot depend upon the existence of the Transportation Agreement

---

[1] Pippin first became aware of the Transportation Agreement on August 19, 2008, during his deposition. Thus, Plaintiffs were unaware of the Transportation Agreement at the time of the incident on September 2, 2002, incident and at the time the lawsuit was filed.

or the Trucker's Agreement. Indeed, Plaintiffs are not a party to the Transportation Agreement and thus Hill-Rom owes no duty to Plaintiffs pursuant to the Transportation Agreement. Hardcore Concrete, LLC v. Fortner Ins. Servs., Inc., 220 S.W.3d 350, 358 (Mo. Ct. App. 2007) ("a defendant who has contracted with another generally owes no duty to a plaintiff who is not a party to the contract."). "This general rule of privity is designed to protect contractual parties from exposure to unlimited liability and to prevent burdening the parties with obligations they have not voluntarily assumed." Haney v. Fire Ins. Exchange, __ S.W.2d __, 2009 WL 294802, *3 (Mo. Ct. App. Feb. 9, 2009) (quoting Owens v. Unified Investigations & Sciences, Inc., 166 S.W.3d 89, 92 (Mo. Ct. App. 2005)). Plaintiffs cite no case credibly supporting their claim that Hill-Rom owed a duty to them pursuant to the Transportation Agreement.

The Trucker's Agreement executed by Plaintiffs and Landstar sets forth the terms and conditions governing Plaintiffs' transportation of freight when dispatched by Landstar. Paragraph eleven explicitly placed the obligation to load shipments which the truckers were dispatched on Plaintiffs, the independent contractor. Likewise, pursuant to Paragraph thirty of the Trucker's Agreement, Plaintiffs have "the right to decide what haulage to perform under this Agreement." Indeed, Pippin acknowledged that he maintained the right to decline any load for which he was dispatched. On ten to fifteen occasions, Plaintiffs had refused loads for various reasons including the weight of the load, insufficient pay, and the location of the loading area. Plaintiffs did not have to give a reason for refusing any load but merely had to inform the dispatcher that they refused the load and then wait for Landstar to issue another dispatch. Further, Plaintiffs' contention that the Agreement obligated a driver to complete haulage of any dispatched load the driver accepts is refuted by his own testimony. Pippin testified that on some occasions, after accepting a dispatched load, he

learned he would not receive assistance loading. In those situations, Pippin contacted Landstar and notified Landstar of the loading, and Landstar would reimburse Plaintiffs. Plaintiffs installed the liftgate on their truck in order to increase their work transporting hospital beds and other freight requiring liftgates. Pippin viewed loading these jobs without asking for additional compensation as a way to continue to receive these profitable jobs from the dispatchers at Landstar. Pippin specifically acknowledged that on September 9, 2002, he decided to load the hospital beds and not complain or ask for assistance in loading, because he wanted to keep getting the profitable dispatches.

Regardless of what the parties intended by executing the Transportation Agreement and the Trucker's Agreement or what Pippin's practice with respect to loading hospital beds for Hill-Rom, the existence of a contractual obligation does not give rise to a tort duty. Hill-Rom had no control of the manner in which Pippin, an independent contractor, chose to load the hospital beds.

Actions in tort and contract are fundamentally different inasmuch as they protect different interests. Grus v. Patton, 790 S.W.2d 936, 941 (Mo. Ct. App. 1990). "Tort actions protect the interest in freedom from various kinds of harms. The duties of conduct which give rise to them are imposed by law, and are based primarily on social policy, and not necessarily upon the will or intention of the parties." Id. at 941-42. In comparison, actions in contract exist to protect the interest in having promises performed. Id. "Contract obligations are imposed because of conduct of the parties manifesting consent and are owed only to specific individuals named in the contract." Id.

Under Missouri law, "[i]n any negligence action, the plaintiff must first establish that a duty exists by the defendant to protect the plaintiff from the injury suffered." Burns v. Black & Veatch Architects, Inc., 854 S.W.2d 450, 452-53 (Mo. Ct. App. 1993). "[A] mere breach of contract does

not provide a basis for tort liability...." Bus. Men's Assurance Co. of America v. Graham, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994). Nonetheless, in determining whether a breach of contract may give rise to tort liability, "the negligent act or omission which breaches the contract may serve as the basis for an action in tort." Id.;see also Preferred Physicians Mut. Mgmt. Group v. Preferred Physicians Mut. Risk Retention, 918 S.W.2d 805, 813 (Mo. Ct. App. 1996) ("Missouri law recognizes that a tort may be committed in the nonobservance of contract duties and that a negligent failure to perform a contractual undertaking may result in tort liability."); Graham, 891 S.W.2d at 452 ("The action may be in tort, however, if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement."). Accordingly, Hill-Rom is entitled to judgment as a matter of law inasmuch as Plaintiffs have failed to prove any tort duty by Hill-Rom.

### B. Hill-Rom Owed No General Common-Law Duty of Care to Plaintiffs

Hill-Rom cannot be held liable as an owner-occupier of land inasmuch as Pippin was injured on land owned and controlled by another.

Premises liability is triggered by assertions that "the cause of the injury or damage was unsafe or defective condition of the property itself." See Nagaragadde v. Pandurangi, 216 S.W.3d 241, 245 (Mo. Ct. App. 2007). Such liability generally is limited to those who own or control the property. State ex rel. Union Elec. Co. v. Dolan, 256 S.W.3d 77, 83-84 (Mo. banc 2008). "A 'common area,' is one reserved by the landlord for the common use of more than one tenant or by himself and a tenant or tenants, as opposed to an area demised to a particular tenant for that tenant's sole and exclusive use." Caples v. Earthgrains Co., 43 S.W.3d 444, 449 (Mo. Ct. App. 2001).

The undisputed evidence establishes that the parking lot on which the truck was parked at the

time of the incident was a common area in the industrial park where the Hill-Rom facility was located. The parking area outside of the Hill-Rom facility was not within the leased premises. The Hill-Rom lease specified that the Hill-Rom premises consisted of 1500 square feet of interior space. Further, the lease expressly defined the parking area as a common area. Likewise, the lease specified that the Landlord "expressly reserves all right, title and interest in and to the sidewalks, walkways, driveways, parking areas or other portions of said complex not herein expressly demised to Tenant or others ... shall be known as "common areas...." Moreover, the lease provided that the Landlord is responsible for landscaping and maintaining the parking area and other common areas. Based on the foregoing, Hill-Rom cannot be liable to Plaintiffs on a theory of premises liability as a matter of law.

Likewise, the undisputed facts do not support a finding that the grade of the parking lot or the common parking lot were dangerous. Missouri has adopted the Restatement of Torts § 343 which provides that a possessor of land is liable to an invitee such as Pippin only if the possessor:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Harris v. Niehaus, 857 S.W.2d 222, 225-26 (Mo. banc 1993) (quoting Restatement (Second) of Torts, § 343)).

Plaintiffs' inability to establish that the slope of the parking lot or the common parking lot creates a dangerous condition precludes them from establishing premises liability. "[W]ithout some testimony or other evidence from which it can be inferred there was a dangerous condition[,] there is no foundation for premises liability." Badovinatz v. Brown, 192 S.W.3d 445, 449 (Mo. Ct. App.

2006). Pippin testified how he thought the incline was gradual and would not pose any problem loading the beds onto his truck. Although Pippin did not have any safety concerns about the slope of the lot, he was aware that there was a gradient, and so he manually set the air brakes once he positioned the truck outside the entrance to the Hill-Rom facility. His deposition testimony is devoid of any assertion that the slope of the parking lot was a dangerous condition. Likewise, the photographs taken outside the Hill-Rom facility show that the parking area gradually slopes upward toward the building. Accordingly, Plaintiffs have failed to establish that the slope of the parking lot created a dangerous condition.

Plaintiffs' reliance on Cupp v. Nat'l R.R. Passenger Corp. to establish a legal basis for a general common law duty by Hill-Rom is misplaced. 138 S.W.2d 766, 772 (Mo. Ct. App. 2004). In any negligence action, the plaintiff must demonstrate that the defendant had a legal duty to protect the plaintiff from injury, that the defendant failed to carry out that duty, and that the defendant's failure proximately caused injury to the plaintiff. Id. at 771. In Cupp, a railroad employee filed suit alleging liability under the Federal Employers Liability Act against his employer railroad and a general negligence action against the seller of a wheel wash system, whose employees were working on the wheel wash at the time of the employee's accident. Id. at 769. Thus, the defendant in Cupp charged with negligence had direct control of the work giving rise to the plaintiff's injury whereas Karguth had no control over Pippin, an independent contractor for another entity. Karguth also had no control over the common parking lot outside of Hill-Rom's leased premises where the loading occurred on September 9, 2002. Accordingly, the undersigned finds that Plaintiffs' reliance on Cupp fails to establish a legal basis for a general common law duty by Hill-Rom.

Nonetheless, even if the facts suggested that the slope of the lot was dangerous, it was an

open and obvious danger precluding liability as a matter of law.

To meet the applicable standard of care a possessor of land must (1) exercise reasonable care; (2) disclose to the invitee all dangerous conditions which are known to the possessor and are likely not to be discovered by the invitee; and (3) see that the premises are safe for the reception of a visitor, or at least ascertain the condition of the land, to give such warning that the invitee may decide intelligently whether or not to accept the invitation, or may protect himself against the danger if does accept it. Under the second element of Section 343, when the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does not breach the standard of care owed to invitees "unless the possessor should anticipate the harm despite such knowledge or obviousness. Harris v. Niehaus, 857 S.W.2d 222, 226 (Mo. banc 1993).

In general, a possessor of land does not have a duty to protect invitees against conditions that are open and obvious as a matter of law. Peterson v. Summit Fitness, Inc., 920 S.W.2d 928, 933 (Mo. Ct. App. 1996). "[W]here the danger is open and obvious as a matter of law and the risk of harm exists only if the plaintiff fails to exercise due care," the possessor will not be held liable. Harris, 857 S.W.2d at 226.

Hill-Rom contends that the dangerous condition of the slope of the driveway was open and obvious, and that the risk of harm existed only due to Pippin's failure to exercise due care, and therefore, should be relieved of liability. The undersigned agrees. The undisputed evidence shows that Pippin himself perceived the alleged dangerous condition, the gradual incline.

In Harris, the plaintiff, an invitee, parked her car on a steep hill, leaving her three children unattended inside the car. Harris, 857 S.W.2d at 225. The car rolled down the hill into a lake, and

the children drowned.  The plaintiff sued the landowners, contending that they failed to warn her about the danger of parking a car on the hill.  The Supreme Court determined that the landowners owed no duty to plaintiff to protect her against conditions that are open and obvious as a matter of law.  Id. at 228.  The Court further found that the slope of the driveway was an open and obvious danger as a matter of law and entered judgment for the defendants.  Id.  The Court emphasized that landowners should reasonably expect invitees to take precautions to avoid harm from open and obvious conditions.  Id. at 226.  Likewise, the Court opined that the defendants could reasonably anticipate that anyone intending to leave children unattended in a parked car on the steep hill would "take effective measures to ensure that a car is secured from the operation of the laws of gravity." Id. at 227.

In Smoot v. Vanderford, the plaintiff was injured by falling off a ladder while trimming tree limbs.  895 S.W.2d 233, 234 (Mo. Ct. App. 1995).  The plaintiff had placed a ladder against the limb he intended to trim and placed the ladder so far from the trunk that the limb sprung upward when the severed portion was released.  The plaintiff sued the landowners, arguing that they created an unreasonable risk by directing him to trim tree limbs from an extension ladder with a chain saw. Citing Harris, on appeal the Missouri Court of Appeals reversed the judgment of the trial court and found that the plaintiff's placement of the ladder on the limb he intended to cut "subjected himself to the danger which he alone created and which was open and obvious as a matter of law."  Id. at 241. Because the risk of harm existed solely due to the plaintiffs failure to exercise due care, the court determined that judgment should be entered in favor of the landowners.  Id.

As in Harris and Smoot, Hill-Rom is entitled to judgment as a matter of law inasmuch as the risk of harm from the open and obvious condition existed only due to Plaintiffs' failure to exercise

due care created the risk of harm. Pippin was aware of the dispatch and the need to load wheeled hospital beds using the liftgate. Pippin admitted to receiving the waybill that indicated the beds' weight prior to loading. Thus, Pippin knew exactly what he would load, how much the beds weighed, and the conditions under which he loaded before loading. Pippin voluntarily chose to undertake the loading without requesting assistance. Indeed, Pippin had no difficulty moving the first bed onto the truck, although he noted some difficulty holding onto the bed while loading. Nonetheless, Pippin decided to undertake the loading of the second bed without requesting assistance. Accordingly, Plaintiffs have failed to establish that Hill-Rom had any general common-law duty to Pippin, and their claims must fail.

### C. Loss of Consortium

Mrs. Pippin's right to recover for loss of consortium is derivative of Pippin's right to recover. Missouri has consistently followed the well-established rule that the plaintiff's right to recover for loss of consortium of her spouse is derivative only, so that if the spouse has no valid claim for personal injuries, the plaintiff cannot recover special damages flowing there from. See Wright v. Barr, 62 S.W.3d 509, 537 (Mo. Ct. App. 2001) ("A claim for loss of consortium is derivative of the injured spouse's claim, which means 'the defendant must be proved to have caused the original injury, which in turn caused the spouse to suffer.'"). Because the claim of Mrs. Pippin for loss of consortium is a derivative cause of action, it must also fail as a matter of law inasmuch as her claim was contingent up on the success of her injured spouse's action.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 28) is GRANTED.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this  17th   day of March, 2009.

                                                    /s/Terry I. Adelman  
                                   UNITED STATES MAGISTRATE JUDGE